The first case on today's docket is John McGill v. Wortham, et al. And we have Mr. Ed Moorman for the appellant and Mr. David DeRee for the appellee. You may proceed when you're prepared to do so. May it please the court, a point of personal privilege, I am just getting over some knee replacement surgery. If you need to sit down or something? If I could just deliver my remarks sitting down. That would be perfectly acceptable. Just at the council table? Yes, the only issue would be, I guess, if we can hear you well enough. But if you just kind of project your voice, I think we'll be fine. Maybe Larry could move the chair up. Would you like to have the chair moved up or would you prefer to stay there? Whatever the court, to whom? I don't know how well we can see you if you're sitting below the podium. Why don't you try being at your chair and just at the desk and project your voice. If we have a problem, we'll let you know. Okay, thank you. I think if it's loud enough for us, it's probably okay. This case is about a pizza restaurant in Woodbridge. It originally was owned by Eric Wortham, who is the defendant, under a franchise from Pizza World USA Franchise Corporation. And that's a company that's owned by Eric Wortham. And his name sounds like it's a big world like Oklahoma. But really, Eric has run a pizza restaurant. He ran that city and he formed this company to franchise mostly the local area and for a while some over in Missouri, some pizza restaurants. So there was a pizza restaurant in the river. And back before all of the controversy started, Pizza World USA Franchise Corporation had created a franchise that gave it to what was called Wood River Pizza Incorporated. And for a while, Eric Wortham himself ran that particular pizza restaurant. Then he was contacted by McGill through a broker, I believe that's the name it was, and there was talk about McGill taking over the Wood River restaurant, pizza restaurant. And at that point, because the Illinois part of the business of Pizza World USA Franchise Corporation had slowed down, for those months or a year or so, Pizza World USA Franchise Corporation was not licensed in Illinois to issue franchises. So the way they did it, the Wood River pizza franchise was assigned to McGill. Were the McGills aware of this? Yes. And that's documented? I'm sorry. Is that documented, that they were aware that at the time they could not sell a franchise? Yes. In fact, there were documents that are part of the record that say there's an assignment document that assigns this particular franchise. And at any rate, McGill went in, operated the pizza place for a while, but eventually closed the doors and went out of business. And then later, McGill sued Wood River, sued them individually, sued Wood River Pizza Incorporated, and sued Pizza World USA Franchise Corporation. And actually, at that point, he also included Eric Wortham's wife, but she's not part of this appeal that Art Frater and the court found in her favor, and so she's not part of this. But the McGill lawsuit alleged that the defendants, Wortham and the corporate defendants, had violated the Illinois statute, which the Illinois Franchise Disclosure Act, which requires that when a franchise is issued in the state of Illinois, there are certain specific documents that have to be supplied and so forth. And McGill alleged that there was a violation of that because certain documents, and especially and particularly a current franchise disclosure document, which is a franchise document that's put out every year, that the one that was supplied to him was a year or two old rather than a current one, and the Illinois Franchise Disclosure Act requires that when there's a franchise created, that that's one document that has to be supplied and there's other documents. So that McGill, one of the accounts to this complaint was that there was a violation of the which gave rise to a right on his part to avoid the contract and seek damages and so forth. He thought that he had been misinformed about certain facts. He also alleged— How does Pizza World get around that? I'm sorry? Tender the documents. Two things. One, since this was a transfer of—and not a new franchise. that the specific documents required in the Franchise Disclosure Act didn't apply to this particular transaction because it wasn't a new franchise. So that as a technical matter, there was not a requirement that they supply it. And there's actually, I guess, a statute section that you're relying on, that 7057 exemption? That's right, because it exempts from transfers or what is not coming from a franchise corporation. It exempts specifically from the requirement. So you're basically saying that you're not controlled by the Franchise Act? Yeah, we're saying that this particular transfer to McGill is not controlled by the Act, which as a technical matter specifically says you have to supply these documents. Now, obviously, when we ask the question, well, how did they get around not supplying this? McGill also said, well, I was misinformed. And even aside from the technical requirements of supplying certain documents, including the current franchise disclosure statement, that he felt that he was misinformed. So he has a one count which says, as a technical matter, you have to comply with the law. And on that alone, I'm compliant with the judgment and damages. And Wharton defended that on the grounds that the law that he fit into the exemption, so the mere fact of not supplying certain documents would not be enough for McGill to escape. McGill claimed that he was misinformed, and one of the claims, and one of the significant claims of what McGill said was that the franchise disclosure document, which he did get, was two or three years old, not the current one, and that misinformed him as to certain things which led to his inability to operate the business the way he anticipated and gave him right on common law fraud to do it. And the way that Wharton defended that was that there was nothing in the current, which would have been the 2011 franchise disclosure document, which had any real relevance or misinformed McGill in any significant way to constitute fraud. But there were a number of other allegations claiming misrepresentation. That's right. They – he had supplied – Wharton had supplied a document called the profit and loss statement, which he testified was not a complete profit and loss statement and showed – it was really just a list of cash and credit card documents, income and expenses. But McGill claimed, well, that was an incomplete – that was an incomplete listing of the income, outflow of the pizza place and was sufficiently misinformed that it led to that fraud. Now, both McGill and Wharton agreed that McGill had been supplied with the full books and records. And McGill said, I just – I never looked at them. I relied on this 53-year-old franchise disclosure document. I relied on this so-called profit and loss statement and a couple of other things. He gave me a lot of other material and it – and McGill testified. I just didn't. I relied on these things and I think they misinformed me. So they – when the case went to arbitration, the arbitrator made her decision on the basis that there was – not – she was mistaken about that. The trial judge found that. I don't think it was really an issue. I think everybody realized that the original agreement, the original transaction between Wharton and McGill was this transfer of the – transfer of the franchise. And the arbitrator was just mistaken about that, that there was no franchise document. I don't think there was really a dispute about that trial judge. When I went back into the circuit court, I found that that was just a mistake on the part of the arbitrator to do wrong on that. And the way she wrote her decision was she said there was no franchise agreement, so Wharton and the corporations are in violation of the Illinois Franchise Disclosure Act. So McGill has the right to bring his lawsuit on that violation. He has the right. And she went on to say McGill raises other matters of common law fraud, but since I've already found that he's entitled to his lawsuit based on this violation of the Franchise Disclosure Act, since I've already decided he can bring the case and prove the case under that, I don't need to go into the rest of these things. So she really made no specific findings as to the question of whether McGill had been misinformed in such a way that he would be entitled to a judgment on common law fraud. She made no such findings. So it's our position that the arbitrator was wrong about this being a violation of the Illinois Franchise Disclosure Act and since it was not a violation of that act, it was not sufficient to support the lawsuit that McGill brought. And since she made no other findings, she didn't find that McGill was guilty of common law fraud and that he had misstated facts that led McGill to enter into this business, that there's really nothing there in her decision. Since one part's wrong and the other part she doesn't make any findings at all, that there's really not enough in her decision to support McGill's lawsuit and that it ought to be sent back. Now, one of the things, obviously, that has to go through your mind and certainly went through my mind, where we're bringing an appeal to where it was an arbitration, is that the traditional view of an arbitration was, and I certainly expected the question from the plaintiff, not from this court itself, that, well, wait a minute, when you go to arbitration, isn't that so we can avoid all this rigmarole and extra litigation and so forth? And in anticipation of that, I did take a look at the law that related to appeals of arbitration and found that the statute, the Illinois statute, had been amended in 2011 and no court really to this day, to my knowledge, has defined what the importance of some of those amendments to the Arbitration Act, which appeared to have brought in the scope of the court's ability to not buy out or to set aside an arbitration court. So there was no case that I decided to say, here's the way that amendment has been defined or interpreted by the Supreme Court of Illinois to my knowledge, hasn't been. And I did cite an article that appeared in a newsletter of the Illinois State Bar Association, which obviously this court did not finalize that article, but I guess I concurred the importance of being persuaded by it. And that defines the amendments, the 2011 amendments, to include the fact that the losing party may challenge the ruling of the arbitrator if the arbitrator did not follow the applicable rules of law. And I think that the argument that I made, that I alluded to, and we may more fully agree, that the arbitrator did not correctly follow the Illinois Franchise Disclosure Act and that those new amendments to the Arbitration Act do give you the right to raise that on appeal, which is what I'm doing. And that, obviously, getting into that, raising that point, and asserting that I do have that right, I guess the question is, well then, if I do have that right, what kind of burden do, assuming I do have the right, what kind of burden do I have? And there's an argument to be made, since we say that the arbitrator really misinterpreted the Illinois statute, and that we're talking about an interpretation of the statute, so my burden would, I think, be denotable. But since everybody agreed that the arbitrator was just loud, wrong, and mistaken about the fact that there really was no underlying franchise agreement, that that's, again, a matter of weight of the evidence. Even if the person who approves this is that heavy, because it's just loud, wrong. There was an underlying franchise agreement, and I think everybody in agreement with that. There was a dispute about whether or not it was valid, because there's a provision, which if you issue a franchise, you've got to, yes, you have to supply the most recent disclosure, and that has to be 14 days. And we argued that that was not relevant here, because the original franchise came from Pizza World USA Franchise Corporation, owned by Eric Worland, to Wood River Pizza Incorporated, owned by Eric Worland. And you've got the document not quite 14 days before the franchise. Thank you very much. Thank you, Mr. Long. We don't have the opportunity for questions. Mr. DeRee, do you agree that there was an underlying franchise agreement? No. Okay. I'm sure I answered it. First of all, I've cited cases, mistakes of fact or law, and I don't submit that there was a mistake here, but mistakes of fact or law on the grounds of vacating or modifying an arbitration award. In this case, we don't have a motion to vacate the arbitration award, which has to be filed within 90 days. I can't hear you, Mr. DeRee. I'm sorry. In this case, we do not have a motion to vacate the arbitration award, which has to be filed within 90 days of the award. What we have is a motion to modify the award, which is governed by subsection or section 13 of the Arbitration Act. I've also addressed an issue, even if it's argued that the motion to modify is treated as a motion to vacate, which would be covered by section 12 of the Arbitration Act. There's simply no grounds for vacating the arbitration award or reversing the trial court judgment, which confirmed the arbitration award into a judgment and denied the motion to modify the arbitration award. As I said, mistakes of fact or law are not grounds for modifying an arbitration award, and in general, the Illinois Supreme Court cases which I have cited point out that the arbitration award, at least theoretically, is intended to be the end of the litigation, not the beginning of the litigation. In fact, in this case, the McGills didn't even want to arbitrate. They filed a lawsuit and were compelled to arbitrate by Pizza World by filing a motion which was granted the motion to compel arbitration, and that's why they arbitrated. The grounds for modifying an arbitration award are an evident miscalculation of figures or a mistake in the description of a person or a thing, or the arbitrator ruled on a matter not submitted to her, or if the award is imperfect in form, not affecting the merits. None of that exists in this case. The grounds for vacating an arbitration award, if the motion to modify is construed as a motion to vacate, is that the award was procured by fraud, or there was evident partiality by the arbitrator, or there was corruption by the arbitrator, or the arbitrator exceeded her powers, or the arbitrator refused to postpone the hearing, or the arbitrator refused to hear material evidence. There's none of that in this case. The appeal basically is based on a letter, opinion letter, written by a section, construction law section of the Illinois Bar Association in which the author said, my gosh, they've amended Section 8 of the Arbitration Act, and it's opening the floodgates, and it's an entirely different method of evaluating arbitration awards. If you would accept that premise, then basically there would be no reason to have arbitration because it would just be the starting point of litigation. In fact, that 2011 amendment to the Arbitration Act did not change Sections 12 and 13, which govern motions to modify and motions to vacate. What it did is add subsection 8c, which required the arbitrators to follow the law that the parties agreed apply. Like if there's a contract that says the law of Connecticut applies, the arbitrator is supposed to apply the law of Connecticut. There's no dispute in this case that the law of Illinois applies. I mean, Section 8c, which was added in 2011, has nothing to do with the scope of appellate review or trial court review of arbitration awards. After you get past the standards that apply, it's clear in this case that there was a violation of Section 5 of the Franchise Disclosure Act by selling a franchise without providing a registered authorized disclosure document. Pizza World, Pizza World Franchise Corp USA, was licensed to sell franchises in Illinois between October 29, 2004 and October 29, 2006. It wasn't authorized again. Did they just let it lapse or something? Yeah, you have to renew it every year. And if you don't, you can't sell franchises, not in Illinois. And they didn't renew it until March 25, 2011. And the gills did not know the status of it? No. And we offered evidence as exhibits during the hearing when we were trying to modify the three-volume transcript of the arbitration. And it's three of the exhibits. I don't recall the numbers right now. So the court has the transcript of the three-day arbitration hearing. What happened on this argument by Pizza World that it didn't have to disclose the 2011 disclosure document, which it just got authorized to issue on March 25, 2011, was that it never explained why it gave a 2008 or rationally explained why it gave a 2008 disclosure document, which was never authorized to begin with. Pizza World wasn't even authorized to sell franchises in 2008 when it created this document that it gave to the McGills. But it did not give them the 2011 document after it became reauthorized to sell franchises on March 25, 2011. Wood River Pizza was established around 2010, about a year earlier. But since Pizza World Franchise Corp. There's two Pizza Worlds. One Pizza World, which doesn't have the words Franchise Corp. in its name, owns the trademark. The Pizza World Franchise Corp. is the franchisor, which supposedly has the license to use the trademark. So in 2010, when Mr. Wortham wanted to create another franchise in Wood River, and he was not authorized to sell franchises, he establishes Wood River Incorporated, Wood River Pizza Incorporated. And then he has Pizza World, not the franchisor, but the holder of the trademark, issue a license to Wood River. That in itself was illegal because that would be a franchise agreement by any court deciding whether this qualifies as a franchise agreement, and it was illegal. But Eric Wortham didn't want to disclose any of that to the McGill's when he was trying to sell them the Wood River Pizza Shop and issue them a new franchise. So he tried to create a franchise agreement on March 31, 2011, six days after Pizza World Franchise Corp. became reauthorized to sell franchises. And he created a document called the Franchise Agreement at that time between Wood River Pizza and Pizza World Franchise Corp. He signed as president of both companies because he owned both companies, so he was the sole shareholder and president of both companies. But he didn't disclose that to the McGill's. The sales documents to the McGill's had a one-page document that says Wood River assigns all of its franchise rights to the McGill's. It didn't say anything about any of these facts about how the franchise agreement for Wood River Pizza was created after Eric Wortham was in negotiations trying to sell the McGill's a franchise. Well, I guess you're also then in disagreement with the conclusion that the trial court reached, which was that there was an agreement, even though there was a remedy of rescission, but that there was an agreement, even though it was… I don't know where you're reading from, but… Well, I'm reading where, in A9, where the court is discussing that basically McGill's are saying there could be no franchisee to franchise contract owing to the technical lapses. But the cases teach that nondisclosure and nonregistration do not themselves automatically render franchise agreements unenforceable. Instead, the franchisee may rescind based on them. So, essentially, they did find an agreement. You mean the trial court? The trial court, yes. I'm not sure about that, but I would disagree if you found a valid agreement because, number one, this March 31, 2011, franchise agreement was supposed to… There was a franchise fee of $9,500, which Wood River was supposed to pay to Pizza World, which admittedly it never paid. That's number one. Number two, in order for that to be a valid franchise agreement created after the fact, so to speak, there would have to be a 14-day period between when Pizza World gave Wood River Pizza a current disclosure document. Well, I guess what the court's saying is the outcome is the same. Yes. They're saying that obviously he was in violation of Section 5. Right. But they did find an agreement. And they're talking about cases in other states that have held the same, in California. I would submit that Pizza World could not issue a franchise agreement to Wood River Pizza on March 31 because it had to give it a disclosure document, the 2011 disclosure document, and wait 14 days. And it couldn't do that until March 25. In other words, the 14-day period could not have elapsed by March 31. And the argument that was advanced by Pizza World was, well, they're all kind of the same company anyway because he owns them all. But that then creates other problems for them, which our argument all along has been that – let me back up on that. But even if they did have a valid agreement or the ability to franchise, which you're saying they didn't, they still could have been in violation of that. Yes. And here's the key. And that's, I think, what this court is saying. The outcome doesn't change. It's the same. And here's the key on that. For there to be an exemption to the violation of Section 5, because the exemption only applies to Section 5, not to Section 6. Right. And for there to be an exemption, it has to be that, quote, if the sale is not effected by or through the franchise owner. And they're not a franchise owner. So obviously it was effected by the franchise owner. He gave them a 2008 franchise disclosure document. So the exemption doesn't apply. And there's a violation there. In addition to that, in Section 6, it doesn't matter whether – even if arguendo there was an exemption for the violation of Section 5 by the exemption provided in Section 7. That would not apply to the violations in Section 6, which provide for statutory fraud, which is defined as much broader than common law fraud. And there, that requirement is any artifice to defraud any misstatement or omission of a material fact. That's how broad it is. And Section 3 of the Act, Franchise Disclosure Act, subsection 11, provides that statutory fraud is much broader than common law fraud specifically provides that. Well, in this case, Eric Wortham gave the McGill the profit and loss statement, which he admitted was false. And the evidence was he told them that this is the profit and loss, and they could determine how well they would do based on how well the store had been doing in the past. He represented it as being a profitable store when it had been an unprofitable store. Not only that, he didn't disclose this Wood River Franchise Agreement. We didn't find out about the Wood River Franchise Agreement until Eric Wortham was being cross-examined in the arbitration hearing. We were supposed to disclose documents before the arbitration hearing to the arbitrator and to opposing sides. They did not produce the Wood River March 31 Franchise Agreement to the arbitrator or to opposing counsel. And we didn't find out that they were trying to make this argument that this was really just an assignment of a franchise because the McGills did get a new franchise agreement. When they signed on, they got a brand-new franchise agreement, which is permissible even if there isn't an assignment. But we didn't find out about this Wood River thing until Eric Wortham was being cross-examined, and that information is located in the transcript, the arbitration transcript. I forget which volume or exhibit, but the transcript pages would be 128 to 131 and 154 to 157. It was only then that any reference was made to the Wood River Franchise Agreement, and which, as the Court indicated, even if it's assumed to be a valid franchise agreement, it doesn't qualify for an exemption under Section 7. Are you happy with the Court's award or decision? With the trial court? Yes. And you would want that affirmed by this Court? We request it be affirmed. It granted most of what the McGills were seeking. It had a $3,100 offset, and it ruled in favor of Michelle Wortham, Eric Wortham's wife. But, yes, we're asking that it be affirmed. And just to sum up, it was a three-day hearing, so there's lots of little issues, fact issues, but the arbitrator decided those. As a matter of fact, the arbitrator did decide. I would differ with Ed as to what the arbitrator said about the fraud findings. This is at the top of page A24 to the appellee's brief. The arbitrator said, in addition to the disclosure problem, the arbitrator finds that respondents presented substantial evidence of other material misrepresentations and omissions of fact to satisfy the elements of fraud in the inducement in connection with the transactions at issue. And the evidence supports that. In addition, she found, this is at page A23 to the appellee's brief, at the bottom, E.W., meaning Eric Wortham, used himself and his various entities interchangeably, without distinction, to purposefully evade the franchise disclosure laws. There was ample evidence to support that. The evidence is overwhelming that what Mr. Wortham and his companies attempted to do was to sell this Wood River store to the McGills without disclosing that it was unprofitable and without disclosing that Pizza World had not been authorized to sell franchises for six years, without disclosing the unlawful licensing agreement under which Wood River Pizza was operating, and without disclosing the current offering circular of 2011, which he refused to provide. And just one of the many facts which the 2011 franchise disclosure document would have persuaded the McGills not to buy is that the director of training was listed as Eric Wortham's son, who was in college, mowed lawns in the summer, and worked part-time in Eric Wortham's franchise, owned by Wortham Development, the Granite City store, the original store, as a surfer. If the McGills had known that this is the director of training of this franchise operation, among many other disclosures, some of the others in comparing the 2008 and 2011 documents, the 2008 document was given to the McGills, the 2011 was not. If you just compare them, the people who were listed as being like director of operations, a guy who operated three franchise stores in 2008, by 2011 he had dropped out of the system entirely and his stores were closed. If the 2011 document had been disclosed, that fact would have been made available to the McGills, and they wouldn't have bought it. So we ask that the judgment of the trial court affirming the arbitration award be affirmed. Thank you, Mr. Dewey. Mr. Mormon, do you have a rebuttal? A quick rebuttal, and I appreciate very much you cutting me some slack. Oh, that's fine. And we can hear you, I think, quite well. Keep it up. Keep your voice up. Okay. Too much to cover in the short time I have, but just to take one small example. The McGills say, why, if we had known that Eric Wardle's son had become the trainer for Pizza World USA Franchise Corporation, if we had known that, we never would have bought this store. But the agreement under which they bought the store called for the training to be done not by Pizza World USA Franchise Corporation, it called for the training to be done by Wood River Pizza King. So it couldn't have made any difference whatsoever who was in charge of training for Pizza World USA Franchise Corporation, since they weren't the ones that were doing the training in the agreement that the McGills made. That might not be the biggest thing, but none of the technical violations, none of the failures to disclose really relate to us showing that this was not a profitable business. McGill admitted that all of those records were available to him, and he just didn't bother to look at them. And his profit and loss statement, which was just a quick outline, but we denied that it was represented as some sort of exhaustive thing. But one thing that it showed was a $60,000 or $70,000 payment out, if anybody relied on that document to decide whether or not to buy a business. Everyone bought the business because it showed this $60,000 or $70,000 payment. They found some technical violations and have tried to make this into common law fraud, or statutory fraud, when there really was not any actual relevance or significant misrepresentation. And I'll reiterate what all the government did. Thank you. Thank you both for your arguments and briefs, and we'll take them around the advisory.